**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

ESTELA ROSAS,

                Defendant.

Case No. 3:23-cr-00084-SLG-KFR

**REPORT AND RECOMMENDATION RE MOTION TO SUPPRESS**

       Before the Court is a Motion to Suppress ("Motion") filed by Defendant Estela Rosas.[1] The government opposes the Motion.[2] The Court held an evidentiary hearing on the Motion on April 22, 2024.[3] Upon review and consideration of the briefing, testimony, and exhibits, the Court finds that the investigative stop of Defendant and her luggage was not supported by reasonable suspicion that she was engaged in drug trafficking. Because all evidence in this case was discovered as a direct result of the unlawful stop, the evidence must be suppressed. Therefore, the Court recommends that the Motion be **GRANTED.**

I.    **BACKGROUND**

    A.  **Facts**

       1.  **Investigators learn about Defendant and her travel.**

       On August 30, 2023, Defendant took a flight from Los Angeles, California, to Anchorage, Alaska.[4] Before Defendant's arrival in Anchorage, law enforcement investigators on the Ted Stevens International Anchorage Airport Interdiction Team ("Interdiction Team") received a tip that Defendant was a "suspicious traveler."[5]

---

[1] Doc. 45.
[2] Doc. 50.
[3] Doc. 59.
[4] Gov't Ex. 1 at 3.
[5] Gov't Ex. 1 at 3; Tr. at 8:10–15.

The tip came from an airline employee who reviewed passenger name record data and provided targeted information to the Interdiction Team.[6]  The airline employee's message indicated that Defendant was flying on a one-way ticket from Los Angeles to Anchorage and that the ticket had been booked the day before the flight.[7]  The tip did not provide any specific information that Defendant would be transporting drugs.[8]

After receiving this information, Investigator Ryan Beene[9] gathered additional information about Defendant and her travel.  Investigator Beene conducted a criminal history check, which revealed that Defendant had a 13- or 14-year-old conviction for being an accomplice in a gang-related shooting in California.[10]  Officer Beene also learned from Defendant's airline that Defendant had two checked bags and that she appeared to be traveling alone.[11]  In addition, Investigator Beene reviewed Defendant's travel history and found out that she had traveled to Anchorage on a one-way ticket twice in the two previous months, with the most recent trip occurring nine days earlier with a similar "last-minute" ticket purchase.[12]

Based on this preliminary information, Investigator Beene decided to contact Defendant upon her arrival in the airport terminal.  Defendant's plane arrived in Anchorage at 12:40 a.m. on August 31, 2023.[13]  Investigators Beene and Laura Reid, both dressed in plain clothes with firearms concealed, waited by Gate C6 in the C concourse at the airport for Defendant to deplane.[14]  Defendant emerged from the gate at or shortly before 12:47 a.m. and began walking down the concourse toward

---

[6] Tr. at 9:2–21, 10:1–13, 48:8–16, 66:19–23.  Airline employees can be paid "about $1,000 a month" for the information provided.  *Id.* at 10:8–10.

[7] *Id.* at 11:16–20.

[8] *Id.* at 47:16–23.

[9] Investigator Beene is a North Slope Borough police officer with ten years of experience conducting alcohol and drug interdiction out of the Anchorage Airport.  *Id.* at 6:16–19, 6:24–25, 7:1–3.

[10] Gov't Ex. 1 at 3; Tr. at 13:1–3, 40:10–22.

[11] Gov't Ex. 1 at 3; Tr. at 13:21–23, 14:7–18.

[12] Gov't Ex. 1 at 3; Tr. at 14:19–24.

[13] Tr. at 4:12–13.

[14] Gov't Ex. 1 at 3; Tr. at 15:14–17, 16:17.

baggage claim.[15]  Investigators Beene and Reid followed Defendant, with Investigator Beene observing that Defendant was walking more slowly than other passengers who had been on the same flight.[16]

### 2. Investigators contact Defendant in the airport concourse.

Investigators Beene and Reid contacted Defendant at 12:47 a.m. near Gate C3 or C4.[17]  Investigator Beene began the encounter by asking Defendant if her name was Estela Rosas, which Defendant confirmed.[18]  Investigator Beene identified himself and Investigator Reid as police officers and told Defendant that they wished to "talk with [her] a little bit about [her] travel."[19]  The investigators each walked alongside Defendant as she continued to walk down the concourse.[20]  According to Investigator Beene, Defendant started walking "faster" after the investigators started talking to her.[21]

Investigator Beene first asked Defendant if she could show the investigators her boarding pass and identification.[22]  Defendant struggled to open her digital boarding pass but ultimately provided it, though she did not "initially" provide identification.[23]  Investigator Beene noted that he "assume[d] that [Defendant] [was] coming from L.A.," which Defendant confirmed.[24]  Investigator Beene asked if "that [was] home for [her]," which Defendant also confirmed.[25]

Investigator Beene then asked Defendant "what br[ought] [her] to Alaska" that day.[26]  Defendant responded that she was "looking for somewhere else to live."[27]

---

[15] Gov't Ex. 1 at 3; Tr. at 4:12–15, 25:3–4.
[16] Gov't Ex. 1 at 3; Tr. at 19:2–4, 43:3.
[17] Tr. at 17:21–24, 25:3–4.
[18] Gov't Ex. 2 at 00:36–43.
[19] *Id.* at 00:43–46.
[20] Tr. at 16:23–25, 59:20–25.
[21] *Id.* at 19:20–22.
[22] Gov't Ex. 2 at 00:47–52.
[23] Gov't Ex. 1 at 3; Tr. at 19:14–15.  The investigators did not repeat their request for identification after Defendant showed them only her boarding pass.  The record does not indicate whether or when Defendant eventually provided identification.
[24] Gov't Ex. 2 at 00:56–58.
[25] *Id.* at 00:58–1:00.
[26] *Id.* at 1:00–01.
[27] *Id.* at 1:02–04.

R&R re Motion to Suppress
*United States v. Rosas*
Case 3:23-cr-00084-SLG-KFR    Document 66    Filed 06/03/24    Page 3 of 27

3

Investigator Beene asked Defendant if she had been to Alaska before, to which Defendant said "yeah" and that she had been "looking for a home."[28] Investigator Beene asked how many times Defendant had been "up here"; Defendant responded that she had visited "a couple" of times in the last "couple of months."[29] Investigator Beene then asked Defendant, "I'm just curious, what inspired you to Alaska?"[30] Defendant appears to have responded, "I like the beauty and how . . . less than L.A.," at which point Investigator Beene offered, "How there's a little less smog?"[31] Defendant replied, "Yeah, of course."[32]

Investigator Beene next asked Defendant if she had any checked bags; Defendant replied that she had two.[33] Investigator Beene asked Defendant if she had packed her bags herself, to which Defendant responded in the affirmative.[34] Investigator Beene asked if anyone had asked Defendant to "bring anything up here," which Defendant denied, and if there were any illegal items in her bags, which Defendant also denied.[35] Investigator Beene asked Defendant if she would be willing to consent to a search of her luggage to verify those answers.[36] Defendant refused.[37] Investigator Beene then asked where Defendant was staying; Defendant replied that she was staying at the Extended Stay.[38]

After this series of questions and approximately one minute and 50 seconds after the initial contact, Investigator Beene said, "So, what I'm going to have you do, you're going to come with us, we're going to do a quick test of your hands . . . ."[39]

---

[28] *Id.* at 1:12–16.
[29] *Id.* at 1:16–25. It is unclear to the Court if Defendant answered "a couple" or "two" months. The distinction is not material to the Court's analysis.
[30] *Id.* at 1:26–28.
[31] *Id.* at 1:28–35.
[32] *Id.* at 1:35–36.
[33] *Id.* at 1:39–44.
[34] *Id.* at 1:50–52.
[35] *Id.* at 1:52–2:05.
[36] *Id.* at 2:07–08.
[37] *Id.* at 2:08–12.
[38] *Id.* at 2:13–17.
[39] *Id.* at 2:19–24.

Defendant interjected, "But you said I'm not under arrest."[40]  Investigator Beene

replied, "Not right now, you're not under arrest, but you're coming with us, we'll do

a quick swab of your hands and your bag, and your checked bags, and if those check

out then you'll be on your merry way, alright?"[41]  After a brief pause, Defendant

asked, "So are you saying I'm under arrest or not?"[42]  Investigator Beene responded,

"So you're kind of in that . . . you don't have to talk to me, but you're not free to go

*right now*."[43]  Investigator Beene then directed Defendant to continue walking past

the exit from the concourse and toward the airport police substation, saying, "We're

going to go this way, actually."[44]

### 3. Investigators bring Defendant to the police substation and to the baggage claim.

Approximately 45 seconds later, the group arrived at the police substation,

where Sergeant Tim Cronin[45] had staged an ion scanner in the hallway.[46]  Sergeant

Cronin used the ion scanner to test Defendant's hands and carry-on bag for the

presence of controlled substances.[47]  The entire process took about three minutes,

and both tests came back negative.[48]

---

[40] *Id.* at 2:11–25.  Investigator Beene had previously told Defendant, "I can kind of go over this, but you're free to go, you don't have to talk to me, you're not under arrest, make sense?" *Id.* at 1:07–10.

[41] *Id.* at 2:25–35.

[42] *Id.* at 2:38–40.

[43] *Id.* at 2:40–44.

[44] *Id.* at 2:45–46.

[45] On the date of the investigators' contact with Defendant, Sergeant Cronin was part of the Alaska State Troopers Statewide Drug Enforcement Unit and was one of two sergeants assigned to the Interdiction Team. Tr. at 63:6–14. He has since been promoted to Lieutenant. Tr. at 63:1.  To avoid confusion, the Court will refer to him using the rank of Sergeant, the rank he held at the time of his actions in this case.

[46] Gov't Ex. 2 at 2:46–3:30; Tr. at 70:17–20, 87:8–15.  An ion scanner is an electronic instrument that can detect and identify trace amounts of controlled substances on a given object. Tr. at 22:17–19, 70:17–19.  The investigators' process for using the ion scanner is to first obtain a sample by swabbing the surface of the object in question, and then to feed the sample into the instrument.  Tr. at 71:6–17.  The instrument analyzes the sample and, within about ten seconds, produces a response indicating whether controlled substances are present.  Tr. at 71:17–20.

[47] Gov't Ex. 1 at 6–7; Tr. at 70:17–25, 71:1–22.

[48] Gov't Ex. 2 at 3:30–6:27; Tr. at 71:1–3.

After the ion scans were completed Investigators Beene and Reid escorted Defendant to the baggage claim for her flight.[49]  Meanwhile, Sergeant Cronin and another investigator worked to locate Defendant's two checked bags before the bags reached the baggage claim.[50]  As Defendant, Investigator Beene, and Investigator Reid were waiting in the baggage claim area, Defendant asked Investigator Beene, "If I tell you the truth, can I get out of this?"[51]  Investigator Beene responded by telling Defendant that he could read her her *Miranda* rights.[52]  As Investigator Beene was starting to do so, however, Defendant interjected, "He's walking away right now," and pointed to a man across the baggage carousel.[53]  Investigator Beene asked Defendant to repeat herself and then asked if she was referring to "that guy right there in the backpack."[54]  Investigator Beene directed Investigator Reid to follow the man Defendant pointed at and then turned back to reading Defendant her *Miranda* rights.[55]  Defendant indicated that she understood and waived her *Miranda* rights.[56]  A few minutes later, Sergeant Cronin informed Investigator Beene that he had ion scanned Defendant's two checked bags and that both had tested positive for the presence of cocaine.[57]

### 4. Investigators bring Defendant and her luggage to the Interdiction Team's office.

Investigators Beene and Reid brought Defendant and her luggage to the Interdiction Team's office, where they questioned her and searched each of her bags with her consent.[58]  The search yielded approximately 20.8 pounds of

---

[49] Gov't Ex. 1 at 2.
[50] Tr. at 72:1–8, 72:23–25.
[51] Gov't Ex. 2 at 9:42–44.
[52] *Id.* at 9:46–50.
[53] *Id.* at 9:50–52; Gov't Ex. 1 at 3.
[54] Gov't Ex. 2 at 9:52–54.
[55] *Id.* at 9:55–10:25.
[56] *Id.* at 10:25–30; Gov't Ex. 1 at 4.
[57] Tr. at 78:15–21; *see also* Gov't Ex. 3 (indicating that ion scans were completed at 1:01 and 1:03 a.m., respectively).
[58] Before directing other investigators to search the bags, Investigator Beene renewed his

methamphetamine and 16.2 pounds of cocaine that were concealed in Defendant's checked bags.[59]  Defendant stated that the man who she identified in the baggage claim area had packed the bags for her and instructed her to check them at the L.A. airport.[60]

### B.  Procedural History

The government indicted Defendant for one count of Possession of Controlled Substances with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).[61] Evidence supporting this charge includes evidence obtained after the investigators contacted Defendant at the airport, in particular, Defendant's incriminating statements and the narcotics found in her checked luggage.

Defendant moved to suppress, arguing that all evidence obtained following her contact with investigators at the airport was the result of an unlawful seizure.[62] Defendant contends that her detention began as an arrest requiring probable cause when Investigator Beene instructed her to come with him and Investigator Reid to the airport police substation.[63]  Defendant argues that Investigator Beene did not have probable cause to arrest her at that time, after having interacted with her for only about two minutes.[64]  In the alternative, Defendant asserts that Investigator Beene did not have reasonable suspicion to stop her at this time because he had only an "inchoate hunch" about her involvement in criminal activity.[65] Defendant further argues that, to the extent her initial seizure was lawful, the investigators' justification for the detention "evaporated" after her hands and carry-on bag tested

---

previous request for Defendant's consent to such a search.  Gov't Ex. 2 at 31:50–59, 33:35–47; Tr. at 79:18–25, 80:1–3.  Investigator Beene explained that Defendant was entitled to refuse to consent to a search but that any refusal would lead the investigators to apply for a search warrant instead, which would take some time. Gov't Ex. 2 at 31:50–33:16. Defendant ultimately allowed the investigators to search her bags. Gov't Ex. 2 at 33:17–18, 33:41–47.
[59] Gov't Ex. 1 at 4.
[60] Gov't Ex. 2 at 23:40–24:02, 25:38–40.
[61] Doc. 15.
[62] Doc. 45 at 1.
[63] *Id.* at 12; Doc. 64 at 1.
[64] Doc. 45 at 11–12.
[65] *Id.* at 12–13.

Case 3:23-cr-00084-SLG-KFR   Document 66   Filed 06/03/24   Page 7 of 27

negative for controlled substances.[66]

The government opposes suppression, reasoning that the detention of Defendant and her luggage was justified from the outset and remained reasonable throughout the contact.[67] The government does not dispute that Defendant was seized approximately two minutes into her encounter with law enforcement, but it maintains that this detention began as an investigative stop requiring only reasonable suspicion.[68] The government asserts that the information Investigator Beene learned about Defendant prior to her arrival in Anchorage combined with his subsequent in-person observations of her created reasonable suspicion that Defendant was involved in criminal activity.[69] The government also argues that the investigation was reasonable in scope and duration and that therefore the stop was still lawfully ongoing when Defendant started making incriminating statements at the baggage claim.[70] The government contends that these statements, along with the ion scan results from the tests of Defendant's checked luggage, established probable cause for a formal arrest.[71]

The Court held an evidentiary hearing on the Motion on April 22, 2024.[72] The government called Investigator Beene and Sergeant Cronin as witnesses at the hearing.[73] Defendant cross-examined the government's witnesses but did not call any of her own.[74] At the close of the hearing, both parties argued in support of their respective positions.[75] After the hearing and at the Court's direction, the parties each filed supplemental briefing.[76]

---

[66] *Id.*
[67] Doc. 50.
[68] *Id.* at 8–9.
[69] *Id.* at 9–10.
[70] *Id.* at 10–13.
[71] *Id.* at 13–14.
[72] Doc. 59.
[73] Tr. at 2.
[74] *Id.*
[75] *Id.* at 97–112.
[76] *Id.* at 113:1–5; Doc. 64; Doc. 65. The only new issue raised in either brief was Defendant's

## II. LEGAL STANDARD

The Fourth Amendment prohibits unreasonable searches and seizures by the government.[77]  The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."[78]  "Accordingly, the Fourth Amendment requires that seizures be, at a minimum, 'reasonable.'"[79]

In addition, the Fourth Amendment generally requires that, to justify a search or seizure, an officer must secure a warrant supported by probable cause.[80]  A warrantless search or seizure is presumed unreasonable unless it falls within a "specifically established and well-delineated exception" to the warrant requirement.[81]  Under one such exception, an officer may briefly detain and investigate a suspect without a warrant when the officer has "a reasonable suspicion of criminal activity based on 'specific and articulable facts and rational inferences from those facts.'"[82]

Reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"[83]  "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'"[84]  The standard takes

---

contention that her consent to the search of her luggage at the airport interdiction office was not voluntary.  Doc. 64 at 3–4.  Therefore, Defendant contends, in the event the Court finds that her detention was justified, it should not apply the inevitable discovery doctrine to excuse the officers' choice not to seek a warrant to search her luggage at the Interdiction Team's office. Doc. 64 at 2–4.

[77] U.S. Const. amend. IV.

[78] *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

[79] *Id.* (citing *Brignoni-Ponce*, 422 U.S. at 878).

[80] *Kentucky v. King*, 563 U.S. 452, 459 (2011).

[81] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)).

[82] *Terry v. Ohio*, 392 U.S. 1, 19–21 (1968).

[83] *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

[84] *Navarette v. California*, 572 U.S. 383, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

into account the totality of the circumstances, and while a mere "hunch" is not enough, the reasonable suspicion standard is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause."[85]

As a general rule, the defendant bears the burden of proof on a motion to suppress evidence.[86]  Because warrantless searches and seizures are presumptively unreasonable, however, the burden of proving that a warrantless search or seizure did not violate the Fourth Amendment is on the government.[87] If the government fails to meet this burden, evidence derived from the illegal search or seizure is "tainted by the illegality and is [thus] inadmissible . . . unless the evidence obtained was 'purged of the primary taint.'"[88]

## III.  DISCUSSION

### A. Defendant Was Seized When Investigator Beene Told Her She Was Not Free to Go.

As an initial matter, the Court must determine the moment at which Defendant was first seized.  "For purposes of the Fourth Amendment, a seizure occurs when an officer, through some form of physical force or show of authority, restrains the liberty of a citizen" such that a reasonable person would have believed they were not free to leave.[89]  In evaluating whether a reasonable person in the defendant's shoes would feel free to leave, courts consider the following factors: "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's . . . manner [implied] that compliance [was required]; and (5) whether the

---

[85] *Id.* (first quoting *Terry*, 392 U.S. at 27; and then quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).
[86] *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).
[87] *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).
[88] *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).
[89] *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001).

officers advised the detainee of [their] right to terminate the encounter."[90]

Here, the parties generally agree that the seizure occurred approximately two minutes into the encounter, when Investigator Beene informed Defendant of the plan to ion scan her hands and luggage and told her that she was "not free to go right now."[91] The Court concurs.

The investigators' initial contact with Defendant as she was walking in the C concourse began as a consensual encounter and thus was not, at first, a seizure.[92] However, the nature of the contact shifted after Investigator Beene told Defendant she was "going to come with [the investigators]" and was "coming with [the investigators]" so that they could test her hands and luggage for controlled substances.[93] These statements were not requests and, together with the statement that Defendant was no longer free to go at that time, indicated that Defendant had no choice but to accompany the officers so that they could test Defendant's hands and luggage for drugs.[94] Despite the semi-public setting,[95] the lack of weapons shown, and Investigator Beene's clarification that Defendant was not under arrest and did not have to talk to him, a reasonable person would not have felt free to terminate the encounter once Investigator Beene told Defendant she was "not free to go right now."[96]

//

//

//

---

[90] *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004).

[91] Gov't Ex. 2 at 2:41–44; Doc. 45 at 12; Doc. 50 at 8–9.

[92] *See Washington*, 490 F.3d at 770 ("No Fourth Amendment seizure occurs when a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen.").

[93] Gov't Ex. 2 at 2:20–27.

[94] *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) (providing that questioning by law enforcement does not constitute a seizure "so long as the officers do not convey a message that compliance with their requests is required").

[95] The Court uses the term "semi-public" because the airport concourse is open only to ticketed members of the public and other authorized individuals.

[96] Gov't Ex. 2 at 2:25–44.

## B. The Government Did Not Have Reasonable Suspicion that Defendant Was Committing a Crime to Justify an Investigative Stop.

The Court next addresses whether Defendant's detention began as an arrest or an investigative stop and whether it was supported by the corresponding level of justification.[97]  Defendant argues that she was arrested at the end of the initial questioning in the concourse, just before the investigators brought her to the police substation, and that therefore the government must—but cannot—show probable cause at that point in time to justify the detention.[98]  The government disagrees, arguing that the detention began as an investigative stop requiring only reasonable suspicion, which the officers had.[99]

### 1. The detention began as an investigative stop.

To distinguish between an investigative stop and an arrest, a court asks whether "a reasonable [innocent] person would conclude that [they were] not free to leave after brief questioning."[100]  In conducting this inquiry, the court considers the totality of the circumstances,[101] including the intrusiveness of the seizure and the reasonableness of that degree of intrusion.[102]

Here, all facts point to the conclusion that the initial seizure was an investigative stop requiring reasonable suspicion of Defendant's involvement in an ongoing crime.  At this point, Defendant had not been handcuffed, the investigators had not drawn their weapons or used any force, and Defendant's freedom of

---

[97] *See Michigan v. Summers*, 452 U.S. 692, 700 (1981) (warrantless arrest requires probable cause); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (investigative stop requires only reasonable suspicion).

[98] Doc. 45 at 12.

[99] Doc. 50 at 8–9.

[100] *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990); *United States v. Pinion*, 800 F.2d 976, 979 (9th Cir. 1982).

[101] *Del Vizo*, 918 F.2d at 824.

[102] *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996); *see also United States v. Place*, 462 U.S. 696, 703 (1983) (holding that courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," and that "[w]hen the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause").

movement was not restricted.[103]  Defendant does not argue, and the record does not support, that the investigators employed any other potentially aggressive tactics before or as part of the seizure.

Instead, Defendant insists that she was arrested because the investigators subsequently "move[d]" her several hundred feet from a public area to a private area while telling her she was not free to leave.[104]  Defendant relies on two U.S. Supreme Court cases to support the notion that this combination of circumstances is so intrusive as to constitute an arrest: *Florida v. Royer*[105] and *Dunaway v. New York*.[106]  However, neither *Royer* nor *Dunaway* stands for this sweeping proposition.

In *Royer*, two police officers investigating narcotics trafficking at Miami International Airport approached the defendant as he made his way to the boarding area for his flight.[107]  Based on the officers' prior observations of the defendant, they believed he fit the "drug courier profile."[108]  The officers identified themselves as police officers working out of the sheriff's office and asked to see the defendant's identification and boarding pass.[109]  After noticing and inquiring about a discrepancy between the names listed on the documents that the defendant provided, the officers informed the defendant that they were actually narcotics investigators and that they had reason to suspect him of transporting narcotics.[110]  The officers held onto the defendant's identification and boarding pass and, without telling the defendant he was free to leave, asked the defendant to accompany them into a room about 40 feet away.[111]  The room turned out to be a "large storage closet" with a desk and two

---

[103] *See Lambert*, 98 F.3d at 1188 (indicating that these three factors increase the intrusiveness of a detention and are important in analyzing whether a detention is a stop or an arrest); Tr. at 16:23–25 (Investigator Beene testifying that he and Investigator Reid "stood side by side with [Defendant], as to not block her egress, and [they] walked and talked, just having a normal conversation").
[104] Tr. at 106:4–107:10.
[105] 460 U.S. 491 (1983).
[106] 442 U.S. 200 (1979); Doc. 45 at 8–13.
[107] 460 U.S. at 493–94.
[108] *Id.* at 493.
[109] *Id.* at 494.
[110] *Id.*
[111] *Id.*

chairs.[112]  One of the officers stayed in the room with the defendant while the other officer retrieved the defendant's checked luggage from the airline—without the defendant's consent—and brought it into the room.[113]

Based on the sum of these circumstances, the Supreme Court held that that the officers' conduct was so intrusive that it exceeded the scope of an otherwise permissible investigative stop.[114]  The Supreme Court noted that the movement of the defendant from the airport concourse to "a more private area" was one contributing factor.[115]  The Supreme Court explained that "there are undoubtedly reasons of safety and security that would justify" such movement as a general matter, but in this case, "there was no indication . . . that such reasons prompted the officers to transfer the site of the encounter from the concourse to the interrogation room."[116]  The Supreme Court concluded that, rather, "the primary interest of the officers was not in having an extended conversation with [the defendant] but in the contents of his luggage, a matter which the officers did not pursue orally with [the defendant] until after the encounter was relocated to the police room."[117]  Furthermore, the Supreme Court observed that forcing the defendant to wait in the police room while one of the officers retrieved his checked luggage to bring back to the room had the effect of significantly prolonging the defendant's detention.[118]  The length of the detention was especially critical because the defendant was trying to catch a flight: had the search of his bags been conducted in the area where they were retrieved and had the search failed to turn up evidence, the defendant "would have been free to go much earlier and with less likelihood of missing his flight, which in itself can be a very serious matter in a variety of circumstances."[119]

---

[112] *Id.*
[113] *Id.*
[114] *Id.* at 504.
[115] *Id.* at 504–05.
[116] *Id.* at 505.
[117] *Id.*
[118] *Id.*
[119] *Id.*

In *Dunaway*, the Supreme Court similarly held that the intrusiveness of the defendant's detention rendered the detention an arrest.[120]  There, in detaining the defendant to question him about a homicide, police officers located the defendant at a neighbor's house, drove him to police headquarters in a police car, and placed him into a room where the officers then interrogated him, all without informing the defendant that he was free to go.[121]  The Supreme Court concluded that these circumstances amounted to more than the sort of "brief and narrowly circumscribed intrusion[]" that may be justified by reasonable suspicion instead of probable cause.[122]

In this case, Defendant's detour to the airport police substation was not so intrusive as to make her detention an arrest.  First, there were legitimate law enforcement reasons for bringing Defendant into a private area to conduct the first round of ion scans.  Sergeant Cronin testified that although the ion scanner is relatively portable and can be moved around the airport with a cart, the machine needs to be plugged in to function.[123]  Sergeant Cronin reasonably decided to stage the ion scanner in a secure location where it was ready to be operated, rather than carting it around or placing it in a public location where it might attract unwanted attention.  As the government points out, either of these alternatives risked "raising alarm, panic, or suspicion of other travelers."[124]

Second, the investigators' execution of their plan to test Defendant's hands and luggage was reasonable.  It may have been slightly more efficient for the investigators to have brought Defendant directly to the location where Investigator Cronin retrieved her checked luggage and to have conducted all the ion scans there.[125]  But the reasonableness of an investigative stop does not depend on whether

---

[120] 442 U.S. at 211–12.
[121] *Id.* at 203.
[122] *Id.* at 212–13.
[123] Tr. at 70:19–21, 87:17–22, 88:8–12.
[124] Doc. 65 at 5.
[125] *See* Tr. at 78:18–20 (Sergeant Cronin testifying that the bag well is a "ten-second walk" from the baggage carousel where Defendant and the two investigators waited).

investigators employed the most efficient strategy possible; instead, the relevant inquiry is whether the chosen strategy was reasonable in light of all the circumstances.[126] Here, the detour to the police substation prolonged Defendant's detention by a maximum of only two or three minutes, and there were no factors that significantly aggravated the detention's seriousness.[127] Unlike in *Royer*, Defendant was contacted at her destination and thus was not in danger of missing a flight. Unlike in *Dunaway*, Defendant was not interrogated. And unlike in both of those cases, the investigators informed Defendant of their plan at the detention's start: when Investigator Beene said that she would be free to go as long as and as soon as the ion scan results of her hands and luggage "checked out," he made clear the bounds of the detention.[128]

Given these facts, a reasonable person in Defendant's position would conclude that their detention was only temporary, and the investigators did not arrest Defendant by moving her to the police substation for the first round of ion scans. The Court therefore concludes that this initial portion of Defendant's detention was an investigative stop.

//

//

---

[126] *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (holding that the "primary inquiry" in assessing whether a detention is too long in duration to be justified as an investigative stop is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant").

[127] *See id.* ("[O]ur cases impose no rigid time limitation on *Terry* stops."); *compare United States v. Mondello*, 927 F.2d 1463, 1470 (9th Cir. 1991) (determining that 30-minute detention did not amount to arrest where agents "worked as quickly as possible to apply [a] sniff test to [defendant's] luggage"), *with Place*, 462 U.S. at 709–10 (holding that "prolonged" 90-minute investigative detention of luggage amounted to arrest).

[128] *See Place*, 462 U.S. at 710 (holding that 90-minute detention of luggage was unreasonable based on length alone, but that unreasonableness was "exacerbated" by agents' failure to "accurately inform [defendant] of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion"); *United States v. Erwin*, 803 F.2d 1505, 1509 (9th Cir. 1986) (reiterating principle set forth in *Place* that informing defendant of procedures officers intend to follow is relevant to evaluation of detention's scope); *see also Royer*, 460 U.S. at 505 (highlighting that officers did not discuss contents of luggage with defendant until after removing him to private room).

### 2. The investigative stop was not justified by reasonable suspicion that Defendant was committing a drug trafficking crime.

Law enforcement may conduct an investigative stop only if the detaining officer has a reasonable suspicion that the person seized is committing or is about to commit a crime.[129] An investigative stop may involve a detention of the suspect or of their belongings.[130] To justify an investigative stop, the detaining officer must identify "[s]pecific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant th[e] intrusion."[131] In evaluating whether the facts known to the detaining officer established reasonable suspicion, courts ask whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[132] "[A]ll relevant factors must be considered in the reasonable suspicion calculus—even those factors that, in a different context, might be entirely innocuous."[133] The detaining officer may rely on their "own experience and specialized training to make inferences from and deductions about the cumulative information available to them," as long as those conclusions are reasonable.[134]

At the evidentiary hearing, Investigator Beene testified that his decision to detain Defendant and her luggage was based on the following factors: (1) Defendant's travel from Los Angeles, a known source of narcotics trafficked into Alaska,[135] (2) Defendant's one-way ticket that had been booked at the "last minute,"

---

[129] *Montero-Camargo*, 208 F.3d at 1129; *United States v. Smith*, 217 F.3d 746, 749 (9th Cir. 2000).

[130] *See Place*, 462 U.S. at 705–07.

[131] *Terry*, 392 U.S. at 21.

[132] *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020).

[133] *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)); *see also United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000) (holding that a stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation).

[134] *Arvizu*, 534 U.S. at 273; *see also United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (holding that a police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation'" (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996))).

[135] Doc. 64 at 12:9–10.

which, in his training and experience, tends to be indicative of drug trafficking;[136] (3) Defendant's history of recent travel to Alaska, which included another one-way, "last-minute" trip from Los Angeles nine days earlier;[137] (4) Defendant's conviction as an accomplice in a gang-related shooting, which suggested to him that Defendant was affiliated with a gang and therefore might be more likely to be linked to crimes such as drug trafficking;[138] (5) Defendant's stated reason for her trip, which he characterized as "unique" and an explanation for last-minute travel that he had never heard before;[139] (6) his observation that Defendant initially walked more slowly than other passengers when she deplaned but then sped up when the investigators contacted her;[140] and (7) his observation that Defendant was nervous, as demonstrated by her consistent avoidance of eye contact, her "rapid breathing," her hands' "excessive[]" shaking, and her voice's "really low tone."[141]

Defendant asserts that this information was insufficient to justify a reasonable suspicion that she was involved in drug trafficking.[142] Defendant points out that she did not provide a false identity to the investigators and that she denied any misconduct.[143] Defendant maintains that the sum of these facts resulted in only an "inchoate hunch" by Investigator Beene that Defendant was engaged in criminal activity.[144] The government disagrees, arguing that the information about Defendant that Investigator Beene obtained prior to the contact, coupled with his in-person observations of Defendant, was sufficient to justify a reasonable suspicion warranting the temporary detention of Defendant and her luggage.[145]

The Court finds that when Investigator Beene communicated to Defendant

---

[136] Tr. at 12:10–14, 14:24–25, 15:1, 21:15–22.
[137] *Id.* at 14:22–25, 15:1.
[138] *Id.* at 13:1–3, 13:9–13.
[139] *Id.* at 20:2–16.
[140] *Id.* at 19:20–22.
[141] *Id.* at 21:2–9.
[142] Doc. 45 at 11–13.
[143] *Id.* at 12.
[144] *Id.*
[145] Doc. 50 at 9.

that she was no longer free to leave, he did not have reasonable suspicion to justify the detention. As the government concedes, Defendant's correspondence to a drug courier profile based only on the information learned about her before the law enforcement contact—her travel itinerary, manner of booking the flight, history of similar recent travel, and criminal history—did not create reasonable suspicion of any wrongdoing.[146] The issue is whether Investigator Beene's on-the-ground observations of Defendant, considered together with the characteristics Defendant shared with a drug courier profile, provided sufficient particularized and objective evidence to establish reasonable suspicion.[147] The Court finds that the government has not met its burden and that the sum of this evidence did not rise to the level of reasonable suspicion.

First, the government provided no evidence that Defendant's movements after exiting the airplane were anything more than a noticeable but unremarkable change in velocity. Defendant was traveling from her gate in the direction of the exit toward the baggage claim area as one would expect following her departure from a long flight.[148] Investigator Beene testified that Defendant initially walked down the concourse more slowly than other passengers and then sped up after the

---

[146] Tr. at 104:7–11; *see also United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (holding that reasonable suspicion may not be based entirely on "broad profiles," "overbroad generalizations," or "a prefabricated or recycled profile of suspicious behavior" (internal quotation marks and citations omitted)); *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam) (holding that drug enforcement agents' reasonable suspicion could not rest solely on factors that, although in conformity with drug courier profile, "describe a very large category of presumably innocent travelers").

[147] *See Erwin*, 803 F.2d at 1511 (holding that officers' live observations of defendant's behavior was particularized evidence that was "sufficient to permit reference to his [drug courier] profile characteristics"); *see also Sokolow*, 490 U.S. at 10 (holding that when determining whether reasonable suspicion exists, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts" (quoting *Gates*, 462 U.S. at 243 n.13)).

[148] Tr. at 41:19–43:12; *cf. United States v. Atchak*, No. 3:23-cr-00042-SLG-KFR-1, 2023 WL 5753618, at *2 (D. Alaska Sept. 6, 2023) (determining that defendant's evasive behavior when approached and asked to stop by police following gunshots "in the middle of the night[]" rose to the level of reasonable suspicion; *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en banc) (finding reasonable suspicion for stop of vehicle engaged in "erratic" driving where defendant's driving "changed as [defendant] approached the checkpoint" and was on same route "commonly used by smugglers coming from Mexico").

investigators contacted her.[149]  Investigator Beene also acknowledged that people exiting planes move at varying speeds.[150]

Although the Court credits Investigator Beene's testimony that Defendant sped up after the initial contact, the record does not indicate that this subjective observation of Defendant's change in speed was so significant that it was suggestive of wrongdoing.[151]  To the contrary, Defendant exited her airplane and walked without any evidence of delay or subterfuge in the proper direction of the baggage claim area.  The audio documenting Defendant's encounter with law enforcement conveys the impression, through the audible clip of footsteps on the airport tile and the tone of the conversation between Defendant and Investigator Beene, that Defendant was moving at a normal speed.[152]  Furthermore, Defendant agreed to speak with the investigators at the outset and remained engaged with them throughout the conversation.  These facts do not indicate that the change of speed was an attempt to dodge or otherwise evade law enforcement in a way that might contribute to reasonable suspicion.[153]

---

[149] Tr. at 19:20–22.

[150] *Id.* at 42:18–22, 43:2–5.

[151] Investigator Reid noted in her report only that Defendant "was walking faster than . . . other people in the concourse."  Doc. 50-1 at 5.  Sergeant Cronin, who followed approximately 30 to 50 feet behind Investigators Beene and Reid and observed Defendant leave Gate C6, did not mention Defendant's walking speed in his testimony or report.  *Id.*; *see also* Tr. at 69:18–70:12.  *Compare United States v. Millan*, 912 F.2d 1014, 1017 (8th Cir. 1990) (holding that, considered together with other factors, "walk[ing] rapidly through the airport without distraction" did not establish reasonable suspicion), *abrogated on other grounds by United States v. McKines*, 933 F.2d 1412 (8th Cir. 1991) (en banc), *and United States v. Beauchamp*, 659 F.3d 560, 564, 570–71 (6th Cir. 2011) (determining that "hurriedly walking away from an officer without making eye contact" in area where officers were receiving many narcotics complaints was not suspicious in context of case because conduct was ambiguous), *with Wardlow*, 528 U.S. at 121–22 (finding reasonable suspicion where defendant, upon sight of officers patrolling for narcotics, ran—not walked—through a gangway and alley).

[152] Gov't Ex. 2 at 0:30–2:40.

[153] *Cf. Erwin*, 803 F.2d 1505, 1510–11 (9th Cir. 1985) (determining that factors contributing to reasonable suspicion included defendant's immediate scanning of the surroundings following exit from plane, his circuitous route through the airport, his "exceedingly fast pace," and his "continually looking back over his shoulder while walking"); *United States v. Hernandez-Rojas*, 470 F. Supp. 1212 (E.D.N.Y. 1979) (determining that most significant factor establishing reasonable suspicion was defendant "veer[ing] to his left, rushing by a

Second, Defendant's answers to Investigator Beene's questions, including her explanation that the purpose of her travel was to look for a home, were not implausible or inconsistent with any information the investigators had. For those questions where law enforcement knew the facts—the frequency of Defendant's travels to Alaska and the number of checked bags she brought with her from California—Defendant provided truthful answers.[154] For those questions where law enforcement did not know the answers—the reason for Defendant's travel and where she would be staying while she was in Alaska—Defendant's responses were logically consistent and not implausible enough to give rise to reasonable suspicion.[155]

---

couple of people, and beg[inning] [to] walk[] very fast, looking out of the corner of his eye as if waiting for [investigator] to catch up with him" after defendant spotted investigator identifying himself to another passenger at airport), *aff'd*, 615 F.2d 1351 (2d Cir. 1979); *Atchak*, 2023 WL 5753618, at *2; *United States v. Peralta*, No. 3:08-cr-00084-RRB-DMS, 2008 WL 11396749, at *4 (D. Alaska Nov. 4, 2008) (finding one of four relevant factors establishing reasonable suspicion to be defendant's refusal to stop upon initiation of a traffic stop because such refusal "could suggest that the occupants [were] trying to hide something in the vehicle"); *United States v. Smith*, 633 F.3d 889, 894 (9th Cir. 2011) (finding that defendant's sudden, unprovoked, headlong flight was suggestive of wrongdoing under the circumstances and established reasonable suspicion); *see also United States v. Fuentes*, 105 F.3d 487, 488–89 (9th Cir. 1997) (concluding that reasonable suspicion existed where, among other factors, defendant looked around airport "as if he were watching for law enforcement people," and defendant waited outside in a car with others until only 10 minutes before his flight, "thus minimizing his exposure to possible law enforcement surveillance in the airport"); *United States v. Campbell*, 627 F. Supp. 320, 324 (D. Alaska 1985) (determining that reasonable suspicion existed based on factors including his "scan[ning] the crowd [after arrival at the airport] in a furtive manner").
[154] *Cf.*, *e.g.*, *United States v. Fuentes*, 105 F.3d 487, 488–89 (9th Cir. 1997) (finding reasonable suspicion where officers knew defendant provided at least two false answers to officers' questions).
[155] *Compare United States v. Wrobel*, 295 F. Supp. 3d 1127, 1137 (D. Idaho 2018) (finding no reasonable suspicion to continue traffic stop where defendant told trooper he was traveling to Montana to visit a friend for about three days and showed trooper rental car agreement with return date three weeks out, highlighting that trooper "failed to ask any follow-up questions regarding [defendant's] itinerary," that trooper failed to inquire about . . . any apparent discrepancy between the length of the rental and [defendant's] travel plans," that defendant "did not tell any stories that conflicted with his plans to go to Montana for approximately three days," that defendant's trip was not "plainly inconsistent with the long-term rental," and that nature of trip was "not so odd that it reasonably suggest[ed] [defendant was] engaged in drug delivery or other illegal activity"), *and United States v. Fifty-Three Thousand Eighty-Two Dollars in U.S. Currency, $53,082.00*, 985 F.2d 245, 247 n.1, 250 (6th Cir. 1993) (finding no reasonable suspicion that claimants were engaged in drug trafficking where claimants made statements that most of $45,000 they were carrying in their socks "was earned working for the Detroit Board of Education," that "part of the money came from lotto winnings," that one claimant "bought, refurbished, and sold HUD

Investigator Beene testified that he found Defendant's given reason for travel "unique," not something he had "heard . . . in over 10 years of doing [airport interdictions]," and "kind of odd" in the context of multiple last-minute trips.[156] According to Investigator Beene, more typical justifications for one-way, last minute travel were "a family emergency or . . . medical emergency or something like that."[157] But the probative value of giving a less typical reason for one-way, last-minute travel is not readily apparent. The unique nature of Defendant's stated reason for travel meant that, in this way, she was unlike other individuals whom Investigator Beene had also suspected of acting as drug mules. Without any indication that Defendant's given reason for travel was false or deviated so far from the norm as to be wholly implausible,[158] the mere fact that the reason struck Investigator Beene as "odd" could either undermine or bolster reasonable suspicion. Without more, in other words, it supports only a hunch of Defendant's involvement in criminal activity.

---

houses," and that both claimants "planned to invest the money in a limousine service in El Paso, Texas, while there visiting friends," none of which could be verified), *with United States v. Low*, 887 F.2d 232, 236 (9th Cir. 1989) (finding reasonable suspicion where defendant who fit drug courier profile stated he had traveled from California to Hawaii to attend a funeral and would be staying at an ex-partner's house, but did not know the full name of the ex-partner or the name of the relative who had died), *United States v. Malone*, 886 F.2d 1162, 1165 (9th Cir. 1989) (finding defendant's inability to give "any valid reasons" for travel plans "particularly persuasive" in establishing reasonable suspicion to detain defendant for suspected drug trafficking), *Erwin*, 803 F.2d at 1511 (finding reasonable suspicion where defendant responded to officers' question with "an explanation that may not have been inherently unbelievable, but was at least not in conformity with all the facts known to the officers"), *and United States v. Brown*, 996 F.3d 998, 1007 (9th Cir. 2021) (finding reasonable suspicion where defendant, who officers questioned after witnessing potential drug deal, provided explanation that "strained credulity" for why he had an unopened multi-tool).

[156] Tr. at 20:7–13; *see also id.* at 49:11–18. ("But her answer that she was moving was not consistent with your prior experience having contacted drug mules?" "It was not a normal answer I would expect to hear.").

[157] *Id.* at 20:8–13.

[158] The Court notes that in addition to providing truthful information in response to questions to which the investigators knew the answers, Defendant was not traveling under an alias. *Cf. Sokolow*, 490 U.S. at 9 (determining that reasonable belief that defendant might be traveling under an alias is a factor that can help give rise to reasonable suspicion); *Campbell*, 627 F. Supp. at 324 (finding reasonable suspicion after consideration of defendant's otherwise innocent activities along with factors including his "flying on a plane ticket with a name different from that on [defendant's] driver's license").

Third, Investigator Beene's observations that Defendant showed signs of nervousness are of dubious value in this case. Investigator Beene testified that "[Defendant's] hands were shaking excessively, she avoided eye contact for almost the entire contact, she had rapid breathing, and she also spoke in a really low tone."[159] To Investigator Beene, these nervous reactions were "common physiological factors of somebody under stress that might be involved in some sort of nefarious activity."[160] However, a defendant's nervousness is often subjective in nature, which casts some doubt on its value in the reasonable suspicion analysis.[161] Indeed, in the Court's review of the audio recording of the initial interaction between law enforcement and Defendant, the Court does not observe the "rapid breathing" or "really low tone" described by Investigator Beene. Moreover, given that Defendant was proceeding through the concourse with the investigators flanking her and amongst others who had just deplaned and were "walking at varying rates,"[162] Defendant's failure to maintain eye contact is not necessarily unusual or suspicious.[163] The value of law enforcement's observations of an individual's nervousness is also undermined here by the fact that the investigators had no prior contact with Defendant and therefore no baseline upon which to judge their

---

[159] Tr. at 21:3–6. Investigator Reid stated in her report that Defendant's hands were "shaking and [that] she was not making a lot of eye contact[.]" Doc. 50-1 at 4. No mention is made of rapid breathing or Defendant's tone of voice.

[160] *Id.* at 21:7-9.

[161] *See United States v. Velazquez*, 1 F.4th 1132, 1140 (9th Cir. 2021) ("[A]s we have recognized, evidence about a defendant's nervousness provides limited objective value and does not even create reasonable suspicion to detain a person[.]"*); see also Montero-Camargo*, 208 F.3d at 1136 (explaining that eye contact or lack thereof may be considered as factor establishing reasonable suspicion, but that factor is generally of "questionable value" because whether eye contact is suspicious in a particular case is "highly subjective" (internal quotation marks omitted) (first quoting *United States v. Munoz*, 604 F.2d 1160, 1160 (9th Cir. 1979); then quoting *United States v. Robert L.*, 874 F.2d 701, 703 (9th Cir. 1989))). The subjective nature of this factor is highlighted by the investigators' varying observations of Defendant's "nervous" behavior. *See supra* note 159.

[162] Tr. at 41:22–42:22.

[163] *See United States v. Escalante*, 990 F.2d 1262 (9th Cir. 1993) (unpublished table decision) ("Typically, failure to maintain eye contact may be properly deemed 'suspicious' in a context wherein eye contact is otherwise natural and unavoidable." (citing *United States v. Nikzad*, 739 F.2d 1431 (9th Cir. 1984); *United States v. Vasquez-Cazares*, 563 F.2d 1329 (9th Cir. 1977) (per curiam), *cert. denied*, 434 U.S. 1021 (1978))).

R&R re Motion to Suppress
*United States v. Rosas*
Case No. 3:23-cr-00084                    23
Case 3:23-cr-00084-SLG-KFR    Document 66    Filed 06/03/24    Page 23 of 27

observations of her physiological response to their questioning.[164]

Moreover, as Investigator Beene testified, innocent people are often initially nervous when they talk to police before their "nerves calm."[165] The process of calming down can take "a couple of minutes."[166] By the Court's calculation, the entire consensual encounter between law enforcement and Defendant lasted slightly less than two minutes. Given Investigator Beene's own experience with respect to how individuals react to law enforcement contact, as well as the equivocal nature of the specific manifestations of nervousness he perceived, Defendant's nervousness contributes little to reasonable suspicion in this case.[167]

Finally, even considered alongside everything else, Defendant's prior criminal conviction does not move the needle. The conviction was over a decade old at the time of the stop and the offense itself did not have any apparent connection to controlled substances.[168] Investigator Beene nevertheless drew an inference that the conviction was suggestive of Defendant's involvement in drug trafficking because it hinted that Defendant might be affiliated with a gang and therefore might be more likely to commit certain types of crimes such as drug trafficking.[169] Given the limited information known to Investigator Beene about the circumstances of the conviction, however, the Court views the value of this dated conviction for a non-drug-related crime to be minimal in supporting a reasonable conclusion that Defendant might be

---

[164] *Cf. United States v. Crapser*, 472 F.3d 1141, 1144 (9th Cir. 2007) (finding relevant officers' observations of defendant's nervousness and shaking hands where this behavior "contrasted sharply with his calm demeanor during a 20-minute traffic stop by these same officers about a week earlier").

[165] Tr. at 44:10–15; *see also id.* at 59:3–12; *United States v. Chavez*, 268 F.3d 719, 727 (9th Cir. 2001) ("Encounters with police officers are necessarily stressful for law-abiders and criminals alike.").

[166] Tr. at 59:13–19.

[167] *See United States v. Sierra-Ayala*, 39 F.4th 1, 14 (1st Cir. 2022) ("Although 'unprovoked flight' or 'nervous, evasive behavior' may provide reasonable suspicion justifying an investigatory stop, [the defendant]—unlike the other individuals present—neither fled nor acted evasively as [law enforcement] approached." (quoting *Wardlow*, 528 U.S. at 124))).

[168] Tr. at 40:3–22.

[169] *Id.* at 13:1–3, 13:9–13.

a drug mule.[170]

In sum, none of the information known to or observed by Investigator Beene fell outside the bounds of otherwise innocent or normal behaviors. Although lawful conduct can form the basis for an investigative stop,[171] here the government has failed to provide evidence that Defendant took any actions that deviated sufficiently from the norm to overcome its burden and support Defendant's warrantless detention. The totality of evidence in this case is that Defendant, a person with a 13- or 14-year-old felony gang-related conviction, was making her third trip to Alaska in the past two months from a known drug source state, and her second one-way, last-minute trip in nine days. She was consensually questioned by law enforcement while walking toward the airport exit after departing her flight, providing truthful answers about her past travel, and reasonable answers about her purpose for traveling and where she would be staying. In addition, Defendant's pre- and post-contact walking speeds differed, and as Defendant walked with law enforcement and answered their questions, she displayed behaviors that law enforcement perceived as a sign of nervousness. At no point before or during the initial two-minute portion of the encounter did Defendant provide false, inconsistent, or evasive information, attempt to dodge law enforcement contact, or exhibit other behavior suggestive of wrongdoing.[172]

Looking at this evidence as a whole and deferring to the reasonable inferences

---

[170] *Compare Puliafico v. County of San Bernardino*, 42 F. Supp. 2d 1000, 1014 (C.D. Cal. 1999) (concluding that 10-year-old unspecified methamphetamine conviction was "too insubstantial" to contribute much to probable cause to arrest individual for manufacturing methamphetamine), *with United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2007) (finding that agent's understanding that defendant had a 15-year-old child pornography conviction was a relevant factor supporting reasonable suspicion to search defendant's computer for child pornography).

[171] *See Arvizu*, 534 U.S. at 273–75 (2002) (emphasizing that *Terry* "precludes [a] divide-and-conquer analysis" and that any reasonable suspicion can be formed by the combination of otherwise innocent facts); *see also United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992) ("[T]he facts used to establish reasonable suspicion need not be inconsistent with innocence." (internal quotation marks omitted)).

[172] *See Sokolow*, 490 U.S. at 10 ("[T]he relevant inquiry [in the reasonable suspicion analysis] is . . . the degree of suspicion that attaches to particular types of noncriminal acts." (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 243 n.13)).

Case 3:23-cr-00084-SLG-KFR    Document 66    Filed 06/03/24    Page 25 of 27

drawn by Investigator Beene based upon his experience, the Court finds that the government has not met its burden in this case. Reasonable suspicion to detain Defendant based upon specific, articulable facts did not exist when Investigator Beene told her that she was "not free to go *right now*." Accordingly, the seizure of Defendant and her luggage for the purpose of conducting ion scans violated the Fourth Amendment. All evidence obtained thereafter, to include Defendant's pre- and post-*Miranda* statements and the drugs seized from her luggage, was the product of this unlawful seizure and is thus inadmissible in this prosecution against her.[173]

## IV. CONCLUSION

The Court finds that Defendant was seized without a warrant when Investigator Beene told her she was not free to go. That seizure was an investigative stop that involved a brief detention of Defendant and her luggage. However, Investigator Beene lacked reasonable suspicion to conduct the stop based on the information he learned about Defendant prior to her arrival in Anchorage and his on-the-ground observations of Defendant at the airport. Because all evidence obtained in this case was derived from the unlawful seizure of Defendant and her luggage, the Court concludes that suppression is warranted.

Accordingly, the Court recommends that Defendant's Motion to Suppress at Docket 45 be **GRANTED**.

DATED this 31st day of May, 2024, at Anchorage, Alaska.

s/ *Kyle F. Reardon*
KYLE F. REARDON
United States Magistrate Judge
District of Alaska

---

[173] The government did not attempt to show or argue that any exception to the exclusionary rule applies. Therefore, the Court's conclusion regarding the initial seizure is determinative of the Motion. As a result, the Court need not address the parties' arguments concerning the reasonableness of the rest of the detention or the voluntariness of Defendant's consent to search her luggage.

**NOTICE OF RIGHT TO OBJECT**

Under 28 U.S.C. § 636(b)(1), a district court may designate a magistrate judge to hear and determine matters pending before the Court. For dispositive matters, a magistrate judge reports findings of fact and provides recommendations to the presiding district court judge.[174] A district court judge may accept, reject, or modify, in whole or in part, the magistrate judge's findings and recommendations.[175]

A party may file written objections to the magistrate judge's findings and recommendations within fourteen (14) days.[176] A response to the objections may be filed within seven (7) days after any objection is filed.[177] Objections and responses are limited to five (5) pages in length and should not merely reargue positions previously presented. Rather, objections and responses should specifically identify the findings or recommendations objected to, the basis of the objection, and any legal authority in support. Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment.[178]

---

[174] 28 U.S.C. § 636(b)(1)(B).
[175] *Id.* § 636(b)(1)(C).
[176] *Id.*; L.M.J.R. 7(a)(1).
[177] L.M.J.R. 7(a)(2).
[178] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).